**PELTON GRAHAM LLC**
Brent E. Pelton
Taylor B. Graham
111 Broadway, Suite 1503
New York, NY 10006
Telephone: (212) 385-9700
www.peltongraham.com

*Attorneys for Plaintiff and the putative*
*FLSA Collective*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **STELIAN MARIN POPA, Individually and On Behalf of All Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>-against-<br><br>**COHEN BROTHERS REALTY CORPORATION and CHARLES S. COHEN, Jointly and Severally,**<br><br>**Defendants.** | **COLLECTIVE ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Stelian Marin Popa (the "Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge as to himself and upon information and belief as to other matters, alleges as follows:

### NATURE OF THE ACTION

1.      Plaintiff is a former personal driver/chauffeur for Defendants. Despite the fact that Plaintiff routinely worked well in excess of forty (40) hours per week, he was paid a fixed weekly salary that did not vary with the number of hours that he worked, such that he did not receive overtime premiums for hours worked in excess of forty (40) in a week.

2.      In addition, since Plaintiff's paystubs typically reflected up to a forty (40) hour

1

workweek, rather than the actual hours that he worked, the wage statements that Plaintiff received did not show an accurate accounting of all hours that he worked during each workweek.

3.      Plaintiff brings this action to recover unpaid overtime pay owed to him pursuant to both the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* and the New York Labor Law ("NYLL"), §§ 650 *et seq.*

4.      Plaintiff also brings claims for failure to provide wage notice and proper wage statements pursuant to NYLL §§ 190 *et seq.* and the supporting regulations.

5.      Plaintiff brings his FLSA claims on behalf of himself and all other similarly situated employees of Defendants and his NYLL claims on behalf of himself and any individuals who consent to opt-in to this action pursuant to § 216(b) of the FLSA (the "Opt-in Plaintiffs").

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337 and 1343, and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.      In addition, the Court has jurisdiction over Plaintiff's claims under the FLSA pursuant to 29 U.S.C. § 216(b).

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants' business is located in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

9.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

10.     On March 20, 2020, New York Governor Andrew M. Cuomo signed Executive Order 202.8 in an effort to stem the spread of COVID-19, which tolls for thirty (30) days "any

specific time limit[s] for the commencement, filing, or service of any legal action, notice, motion or other process or proceeding" under any New York State laws or court procedural rules. The thirty (30)-day tolling period began on March 20, 2020 and continued until April 19, 2020. On April 7, 2020, Governor Cuomo signed Executive Order 202.14, which extended the tolling period to May 7, 2020. Subsequently, on May 7, 2020, Governor Cuomo issued Executive Order 202.28, tolling all statutes of limitations for an additional thirty (30) days through June 6, 2020. On June 6, 2020, Governor Cuomo issued Executive Order 202.38, tolling all statutes of limitations until July 6, 2020. On July 7, 2020, Governor Cuomo issued Executive Order 202.48 tolling all statutes of limitations until August 5, 2020. On August 5, 2020, Governor Cuomo issued Executive Order 202.55, which tolled all statutes of limitations until September 4, 2020. On September 4, 2020, Governor Cuomo signed Executive Order 202.60, which extended the tolling period an additional thirty (30) days to October 4, 2020. On October 4, 2020, Governor Cuomo issued Executive Order 202.67, which extended the tolling period to November 3, 2020. In total, the Executive Orders set forth herein provided for a toll of two hundred and twenty-eight (228) days.

## THE PARTIES

**Plaintiff:**

11.     Plaintiff Stelian Marin Popa ("Popa") was, at all relevant times, an adult individual residing in Queens County, New York.

12.     Throughout the relevant time period, Plaintiff performed work for Defendants in New York, Connecticut, and New Jersey.

13.     Plaintiff consents in writing to be a party to this action, pursuant to 29 U.S.C. § 216(b), and his consent form is attached hereto and is incorporated herein.

**Defendants:**

3

14.     <u>Defendant Cohen Brothers Realty Corporation</u> ("Cohen Brothers Realty" or the "Corporate Defendant") is an active corporation with its principal place of business at 750 Lexington Avenue, 28th Floor, New York, NY 10222 and a New York State Department of State service of process address of 635 Fairfield Circle, 28th Floor, Westfield, NJ 07090.

15.     The Corporate Defendant was registered with the New York State Department of State on November 10, 1981.

16.     Upon information and belief, Defendant <u>Charles Steven Cohen</u> ("Cohen" or the "Individual Defendant") is an owner, officer and operator of the Corporate Defendant, serving multiple roles in the company's management team including but not limited to Chief Executive Officer and Chairman.

17.     Defendant Cohen is a prominent real estate developer and investor of several high-end office buildings throughout New York City. Upon information and belief, Cohen also has ownership interests in luxury brands, including but not limited to Harrys of London, Richard James Savile Row, and T. Anthony.

18.     Upon information and belief, the Individual Defendant maintained operational control over and manages the domestic service workers employed by the Corporate Defendant by supervising and determining their wages and compensation, establishing their work schedules, maintaining employee records, authorizing vacation, sick, and personal leave, and through possessing the authority to hire and fire such employees, including Plaintiff.

19.     Upon information and belief, at all relevant times, the Corporate Defendant has had gross revenues in excess of $500,000.00.

20.     At all relevant times, the Defendants have each been an employer engaged in interstate commerce and/or the production of goods for commerce within the meaning of the

FLSA, 29 U.S.C. §§ 206(a) and 207(a).

21.     At all relevant times, Defendants employed, and/or continue to employ, Plaintiff and each of the Opt-In Plaintiffs within the meaning of the FLSA.

22.     During the relevant time period, for his work performing personal driving and other errands for Defendants, Plaintiff received paystubs from Cohen Brothers Realty Corporation.

23.     At all relevant times, Plaintiff and the Opt-In Plaintiffs were employed by Defendants within the meaning of the NYLL, §§ 2 and 651.

## FLSA COLLECTIVE ACTION ALLEGATIONS

24.     Pursuant to 29 U.S.C. §§ 207 & 216(b), Plaintiff brings his First Cause of Action as a collective action under the FLSA on behalf of himself and the following collective:

> All persons employed by Cohen Brothers Realty Corporation at any time since June 6, 2020 through the present (the "Collective Action Period") to perform domestic work-related services, including drivers/chauffeurs (the "Collective Action Members").

25.     A collective action is appropriate in this circumstance because Plaintiff and the Collective Action Members are similarly situated in that they were hired to perform domestic work-related services, worked well in excess of forty (40) hours per week and were paid a fixed salary that did not include overtime premiums for hours worked in excess of forty (40) in a week. As a result of these policies, Plaintiff and the Collective Action Members have suffered significant unpaid overtime premium payments for all hours worked in excess of forty (40) hours per week.

26.     Plaintiff and the Collective Action Members have substantially similar job duties, in that they were all employed by Defendants to provide non-exempt domestic services and were paid pursuant to a similar, if not the same, payment structure. Since Defendants only compensated Plaintiff and Defendants' other domestic worker employees, including personal drivers/chauffeurs, up to a forty (40)-hour workweek, Plaintiff and the Collective Action Members

were not paid for a significant number of overtime work hours each week.

## **STATEMENT OF FACTS**

### **Defendants' Company**

27.    Throughout the relevant time period, Defendants have employed individuals to provide various personal services to Defendant Cohen, including, but not limited to, personal drivers/chauffeur services.

28.    Upon information and belief, Defendants employed at least twelve (12) personal drivers/chauffeurs during the relevant time period, who were responsible for driving Defendant Cohen's immediate family members and providing other domestic work-related services at Defendants' main office.

### **Plaintiff's Work for Defendants**

29.    Plaintiff Popa was employed by Defendants as a personal driver/chauffeur from in or around January 7, 2013 through on or about September 27, 2022 (the "Popa Employment Period").

30.    Plaintiff Popa was hired to service the Individual Defendant, his spouse Clodagh Jacobs Cohen ("C. Cohen"), and their minor children, to various destinations including Defendants' offices, doctor and dentist appointments, airports, children's school(s) and extracurricular facilities, family social events, and other assigned locations.

31.    In addition to driving the Individual Defendant and his family members to assigned destinations, Popa was also responsible for maintaining Defendants' many vehicles, including a Ferrari, Ford Flex, Mercedes GL, Lincoln Aviator, Tesla Model X, Mercedes Mayback, Bentley, a Lamborghini, and others which he drove when performing his chauffeur duties and whose models Plaintiff is no longer able to recall. As part of his duties, Popa was expected to ensure that

the vehicles were washed and that all necessary registrations, mechanic inspections and services were fulfilled and updated.

32.     At all times, Popa drove small personal vehicles with a gross vehicle weight rating of less than 10,000 pounds.

33.     As part of his daily tasks and schedule, Popa was also required to perform other domestic services outside of Defendants' main office, including but not limited to: picking up dry cleaning or items at the tailor; picking up prescriptions; driving Defendants' other domestic service workers (e.g., "Mirna" and others whose names Popa no longer recalls) to the supermarket to perform grocery shopping for the Individual Defendant and C. Cohen and assist them with dropping off these items to their home; picking up meals for the Individual Defendant; picking up and dropping off bags and gift items for the Individual Defendant's friends at their apartment; picking up materials, checks, and correspondence for the Individual Defendant's realty offices located in Manhattan and dropping them off in other offices located in Westchester and New Jersey; and communicating and arranging with the Individual Defendant's main office executive assistants who worked from the 750 Lexington Avenue address to pick up checks and mail that needed to be postmarked and delivered to FedEx locations on the dates when Popa was assigned this work.

34.     For approximately three to four (3-4) months at the start of the COVID-19 pandemic, beginning in March 2020, Popa was also required to drive one of the Individual Defendant's domestic workers to Greenwich, Connecticut so she could attend to the Individual Defendant's mother, "Gloria," and then drive back with this domestic worker into Manhattan to return Defendant's vehicle(s) to the parking garage. In addition, during several shifts, Popa was required to pick up mail at Defendants' office at 750 Lexington Avenue, and make bank deposits,

as instructed, due to a shortage of office staff members available to perform those services. In addition, for a couple of months in 2020, Popa was also required to shred documents at the 750 Lexington Avenue office for "Steven Cherniak," (hereinafter referred to as "Cherniak") who, upon information and belief, serves as Chief Operating Officer of the Corporate Defendant.

35.     Throughout the Popa Employment Period, Plaintiff Popa's duties, daily itinerary and responsibilities were delegated by both the Individual Defendant and his wife, C. Cohen. Popa typically received his daily tasks verbally or via text messages from the Individual Defendant or C. Cohen.

36.     During the Popa Employment Period, Plaintiff Popa worked exclusively for Defendants, as that was one of the conditions requested by Defendant Cohen during Popa's hiring interview. Specifically, during the interview, Popa was told by Defendant Cohen that he was being hired to "stay with him," and at no point was Plaintiff available for hire by other individual members of the public or by other entities. In fact, Popa was expected to be available at all times during his assigned hours, and sometimes even after he had dropped off Defendants' vehicles at the parking garage. On one specific occasion, Popa had already dropped off Defendants' vehicle at the parking garage at the end of the shift, and was nonetheless asked by the Individual Defendant to return to Manhattan and pick up a bag of grocery items and drop off the items at their home.

37.     Throughout the Popa Employment Period, although Plaintiff Popa was formally scheduled to work five (5) days per week, with Saturday and Sunday off, he was often required to work weekends to drive the Individual Defendant or C. Cohen and their family members to private dinners and social events in Greenwich, Connecticut and in Manhattan. On weekdays, Popa typically worked ten (10) to twelve (12)-hour shifts, depending on his assignments each day. Typically, unless S. Cohen was scheduled to be at the 750 Lexington Avenue office before 7:00

a.m. or had a doctor's appointment on any given day, Popa began his shift at approximately 7:00 a.m. when he was required to pick up the Defendants' vehicle at the parking garage and worked until between approximately 5:00 p.m. and 7:00 p.m., and sometimes later depending on when he had completed his tasks and was able to return Defendants' vehicle to the parking garage. In total, Popa typically worked between approximately fifty (50) to sixty (60) hours per week. On days when the Individual Defendant was scheduled to be at the office before 7:00 a.m. or had an early doctor's appointment scheduled, Popa was required to pick up Defendants' vehicle at the parking garage by 6:00 a.m. As described in more detail below, Popa was often assigned additional work at the end of his shift and/or on weekends depending on the Individual Defendants' social calendar, such that often he worked many more hours per week.

38.    Approximately two (2) times per week, during the Individual Defendant's children's sports/extracurricular seasons, Popa worked longer shifts of between twelve to thirteen (12-13), and sometimes up to sixteen (16) hours per day, from approximately 7:00 a.m. to between approximately 10:00 p.m. and 11:00 p.m., for a total of approximately fifty (50) to seventy-two (72) hours per week. On certain occasions when Popa was required to work shifts between fifteen to sixteen (15-16) hours, Popa was sometimes released from work the following day between approximately 4:30 p.m. to 5:30 p.m. given the extra hours worked in prior day's schedule.

39.    At times, when the Individual Defendant's personal driver was unavailable on weekends, Popa was told by the Individual Defendant or his wife that he needed to pick up the car at the parking garage because he was needed for "two to three hours" during the weekend. This typically occurred when the Individual Defendant and/or his wife planned to attend a social event or scheduled to have dinner in Manhattan or in Greenwich, Connecticut. Although Popa was told that he was needed for a short time frame (e.g., "2-3 hours"), Defendants did not account for the

time Popa spent picking up Defendants' vehicles at the parking garage, the time spent driving from

the parking garage to Greenwich, Connecticut or the time spent returning the vehicle to the parking

garage in Manhattan at the end of the evening. When Popa was required to work on weekends,

Popa often worked a total of between eight to ten (8-10) hour shifts, and sometimes up to sixteen

(16) hour shifts, depending on the duration of the social events, the location of the assigned

destination, and traffic to/from the parking garage and the Individual Defendant's home in

Greenwich, Connecticut, which were not reflected on the paystubs he received with his wage

payments.

40.     In addition to his typical schedule, between approximately October 2019 to January

2020, Popa worked shifts of between fifteen to eighteen (15-18) hours and sometimes more, when

he was required to drive the Individual Defendant's son "Rex" to Bar Mitzvahs, which often ended

between 11:00 p.m. and midnight. Popa was required to remain near the event's designated address

during the duration of the Bar Mitzvah, drive "Rex" to the Individual Defendant's home either in

Manhattan or Greenwich, Connecticut and return the vehicle to the parking garage after the event.

On such days, Popa worked from between approximately 7:00 a.m. to between approximately 1:00

a.m. and 2:00 a.m. the next morning, depending on traffic or the location of the event.

41.     On certain weeks, specifically during the summer period when schools are closed,

Popa worked from approximately 9:00 a.m. to between approximately 5:30 p.m. to 6:00 p.m., for

a total of between approximately forty-two and a half to forty-five (42.5-45) hours per week,

excluding any weekend hours he was required to work, as mentioned above.

42.     Throughout the relevant time period, Plaintiff Popa received his wages from

Defendants via a payroll check and was provided access to his paystubs through ADP, which

typically reflected up to a total of forty (40) hours worked per week. At no point during his

employment did any of Popa's paystubs show the significant overtime hours he worked, or the additional work he was required to perform on weekends as described in Paragraph 39 above.

43.     Plaintiff did not receive a wage notice from Defendants, at hiring or otherwise during his employment, detailing, among other items, his wage rate(s), name of his employer, and any credits that were being taken by Defendants against Plaintiff's wages.

44.     Plaintiff Popa's paystubs show that he was paid by "Cohen Brothers Realty Corporation."

45.     Plaintiff Popa was paid a flat weekly salary of approximately $ 1,057.68 in 2017.

46.     Plaintiff Popa was paid a flat weekly salary of approximately $1,153.84 in 2018.

47.     Plaintiff Popa was paid a flat weekly salary of approximately $1,250.00 in 2019.

48.     Plaintiff Popa was paid a flat weekly salary of approximately $1,346.16 in 2020.

49.     Plaintiff Popa was paid a flat weekly salary of approximately $1,442.31 in 2021.

50.     Plaintiff Popa was paid a flat weekly salary of approximately $1,538.47 in 2022.

51.     Throughout the Popa Employment Period, Popa was rarely, if ever, able to take a thirty (30)-minute uninterrupted meal break.

52.     At no point during his employment with Defendants, was Plaintiff permitted to track or record the actual hours he worked. Defendants did not maintain a formal timekeeping system and did not require Popa to keep an accounting of the hours he worked.

53.     In or around 2022, Popa received a payment in the gross amount of $30,480.77 in connection with an unpaid wage investigation led by the U.S. Department of Labor, which covered the period between October 7, 2017 through October 5, 2019. Upon information and belief, the investigation was initiated by a complaint that was filed in 2018 by another individual employed by Defendants as a driver/chauffeur. Upon information and belief, as a result of that investigation,

Defendants were found to owe $76,618.57 in unpaid overtime wages to some drivers/chauffeurs, including Plaintiff.

54.     On at least three (3) occasions in or around November 2020, May 2021, and April 2022, Popa met with the Individual Defendant to request an increase in his wages because he believed that he was not properly compensated for the total hours he worked each week and was facing some financial difficulties. During the first encounter in or around November 2020, Popa expressed to the Individual Defendant that he was moving apartments and was having trouble collecting the rental payments and deposit for his move. Popa requested an increase in his wages and expressed his concerns that he was required to work a significant number of overtime hours per week but that he was only paid for up to a forty (40) hour workweek, as reflected on his paystubs. The Individual Defendant's response was that he "complained too much" and reminded Popa that he had signed a contract to work at least sixty (60) hours per week. Popa begged that the Individual Defendant reconsider his position and that he attempt to understand that Popa also had a family to provide for financially. In response, the Individual Defendant issued a personal check to Plaintiffs in the amount of $5,000.00, which Plaintiff understood to represent a bonus or advancement on his wages, but was not required to sign any documentation with respect to that payment.

55.     In approximately May 2021, Popa requested from the Individual Defendant a raise of $5,000.00 to his annual salary, which was granted. Popa was not required to sign any document nor was he provided with any personal check in connection with the increased annual salary.

56.     In or around April 2022, Popa met again with the Individual Defendant to request an increase in his salary and showed the Individual Defendant copies of his bills, rental payments and explained that he had increased financial responsibilities since Popa's daughter was going to

college. During the meeting with the Individual Defendant, Popa requested an increase of $10,000.00 in his annual salary, given his years of service and that he consistently worked beyond forty (40) hours per week with no overtime pay. The Individual Defendant told Popa that he would need to speak with Cherniak with respect to his request, which Popa did. During the meeting with Cherniak, Popa was told that he would receive the $10,000.00 increase and that $5,000.00 of this amount would be pro-rated throughout the year and reflected on his paystubs, and that the remaining $5,000.00 would be considered a "loan/advancement of wages." Popa explained that he was unable to understand the content of that document as it was drafted entirely in English which is not his first language. Cherniak stated that he would explain the document to him and stated that within a year of the payment being issued, Cohen Brothers Realty Corporation would deem the full amount satisfied by Popa's employment. Cherniak specifically stated "there is nothing concerning for you" as we will give you the payment and within a year the document will be destroyed. At no point was Popa informed that he would need to personally make any repayments in the future nor did he receive any additional compensation along with his weekly wage payments.

57.     During the Popa Employment Period, Popa was not disciplined for the quality of his work or his attendance. In fact, Popa avoided requesting his sick days, and followed Defendants' requirements with his respect to when he was permitted to take vacation, and personal days – i.e., specifically when the Individual Defendants and his family were on vacation or that coverage be available when he was out. Plaintiff was often told by C. Cohen that she was grateful to have him and frequently praised his work and his availability, particularly during the weekend.

58.     On Thursday, September 22, 2022, Popa showed up to his shift even though he was feeling ill and was displaying several symptoms. Nonetheless, Popa dropped off the Individual Defendant's children at school and reported to the 750 Lexington Avenue office to inform him

that he was feeling sick. Popa spoke with the Individual Defendant's personal assistant, Nancy Otero ("Otero"), who referred him to Cherniak. Cherniak requested that Popa make an appointment which Popa attempted to do but was told by the medical office that there was no availability for an appointment. Popa noticed that Cherniak seemed upset by his request to go home and suggested that he be permitted to go home for the day without pay. That same day, Otero called Popa and stated that Cherniak wanted his doctor's contact information so he could make an appointment for him. Although Popa was surprised by the persistence given that he had informed him already that the medical office had denied his request for an appointment, he immediately texted Otero the information for his doctor, and was later told that he should go to the doctor because an appointment had been secured by Cherniak. Popa was released from his shift at approximately 1:00 p.m. so he could attend the appointment. Since Popa was not cleared to return to work and was instructed to go home and rest by the doctor for at least three (3) days (due to his condition and high blood pressure rate during his visit), Popa did not return to work. That evening, Popa received a message from Otero, and was told that he should rest and stay home the next day and that another driver "David" would be called to cover his shift for the following day. Popa also sent Otero the "Return to Work" note he had received from his doctor instructing him to rest for three (3)-days. Popa did not receive any instructions that he was needed for the weekend from the Individual Defendant or C. Cohen. The following week, Popa completed his shift on Monday September 26, 2022 and reported to work the next day, on September 27, 2022. At around 2:30 p.m. on September 27, 2022, Popa was called into a meeting with Cherniak who informed him that he was terminated without any further clarification. Popa was also provided with a termination agreement dated September 27, 2022, which he was told he needed to sign and return. Popa did not return this document because he did not comprehend the terms of the agreement and was

advised by a friend not to sign without seeking advice from legal counsel.

59.     In or around November 2022, Popa received a notice from Cherniak informing him that he owed the Corporate Defendant a total amount of $11,966.72 based on two (2) promissory notes that he had allegedly agreed to repay dated "November 24, 2020" and "April 8, 2022," which had respectively accrued interest rates of 2.5% and 5.0% per annum.

**<u>Defendants' Unlawful Policies</u>**

60.     Plaintiff and the Collective Action Members were all paid pursuant to the same corporate policies of Defendants, specifically with respect to Defendants' practices of paying their domestic service workers flat weekly salary rates which did not include legally required overtime premiums Plaintiff and the Collective Action Members were entitled to receive.

61.     Throughout the Popa Employment Period, the Individual Defendant verbally acknowledged that Popa was required to work beyond forty (40) hours per week, as he often reminded Popa that he had agreed to work at least sixty (60) hours per week upon hiring. Furthermore, although on various occasions, Popa expressed his concerns that he was not paid properly for all hours worked and even requested that Defendants track his total hours worked, Popa was repeatedly told by the Individual Defendant "that he should not complain" and that he was hired by him [Defendant Cohen] and therefore "you have to do what I say."

62.     Since Defendants did not pay Plaintiff and the Opt-In Plaintiffs for the actual time worked each week, at no time did Plaintiff's or the Opt-In Plaintiffs' paystubs reflect their actual hours worked. Thus, Defendants have failed to provide Plaintiff and the Opt-In Plaintiffs with proper statement of wages containing the dates of work covered by their wage payments; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross

wages; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the complete and total number of hours worked, including overtime hours worked if applicable; deductions; and net wages.

63.     Upon information and belief, all of Defendants' domestic service worker employees, including personal drivers/chauffeurs, were not paid at least one and one-half (1.5) their regular hourly rate for all hours worked in excess of forty (40) hours per week.

64.     Upon information and belief, throughout the relevant time period and continuing until today, Defendants failed to maintain accurate and sufficient time and payroll records or provide such records to employees.

**FIRST CAUSE OF ACTION**
**FAIR LABOR STANDARDS ACT – UNPAID OVERTIME**
**(Brought on Behalf of Plaintiff and the Collective Action Members)**

65.     Plaintiff, on behalf of himself and the Collective Action Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

66.     Defendants violated the FLSA overtime rights of Plaintiff and the Collective Action Members by improperly failing to pay overtime premiums of one and one-half (1.5) times employees' regular hourly rates for all hours worked in excess of forty (40) hours per week.

67.     By failing to pay overtime at a rate not less than one and one-half (1.5) times the regular rate of pay for work performed in excess of 40 hours per week, Defendants have violated and continue to violate the FLSA, 29 U.S.C. §§ 201 *et seq.*, including 29 U.S.C. §§ 207(a)(1) and 215(a)(2).

68.     The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

69.     Defendants' failure to pay overtime caused Plaintiff and the Collective Action Members to suffer loss of wages and interest thereon. Plaintiff and the Collective Action Members are entitled to recover from Defendants their unpaid overtime premium compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action.

**SECOND CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNPAID OVERTIME**
**(Brought on Behalf of Plaintiff and the Opt-In Plaintiffs)**

70.     Plaintiff, on behalf of himself and the Opt-In Plaintiffs, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

71.     Defendants violated the NYLL overtime rights of the Plaintiff and the Opt-In Plaintiffs by failing to pay overtime premiums consisting of one and one-half (1.5) times employees' regular hourly rates for all hours worked in excess of forty (40) hours per week.

72.     Defendants willfully violated Plaintiff's and the Opt-In Plaintiffs' rights by failing to pay overtime compensation at a rate of not less than one and one-half (1.5) times the regular rate of pay for hours worked in excess of 40 each week, in violation of the NYLL and regulations promulgated thereunder.

73.     Defendants' failure to pay overtime premium compensation caused Plaintiff and the Opt-In Plaintiffs to suffer loss of wages and interest thereon. Plaintiff and the Opt-In Plaintiffs are entitled to recover from Defendants their unpaid overtime compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

### THIRD CAUSE OF ACTION
### <u>NEW YORK LABOR LAW – WAGE STATEMENT VIOLATIONS</u>
### (Brought on Behalf of Plaintiff and the Opt-In Plaintiffs)

74.    Plaintiff, on behalf of himself and the Opt-In Plaintiffs, repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

75.    Defendants have willfully failed to supply Plaintiff and the Opt-In Plaintiffs a proper wage statement as required by NYLL § 195(3).

76.    Due to Defendants' violations of the NYLL, Plaintiff and the Opt-In Plaintiffs are entitled to recover from Defendants two hundred fifty dollars ($250.00) per employee for each day that the violations occurred or continue to occur, or a total of five thousand dollars ($5,000) per employee, as provided for by NYLL § 198(1-d), reasonable attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief.

### FOURTH CAUSE OF ACTION
### <u>NEW YORK LABOR LAW – FAILURE TO PROVIDE WAGE NOTICE</u>
### (Brought on Behalf of Plaintiff and the Opt-In Plaintiffs)

77.    Plaintiff, on behalf of himself and the Opt-In Plaintiffs, repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

78.    Defendants have willfully failed to supply Plaintiff notice when he was hired and/or when his wage rate(s) changed, as required by Article 6, § 195(1), in English or in the language identified by Plaintiff as his primary language, containing Plaintiff's rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay, if applicable; the regular pay day designated by the employer in accordance with the NYLL, Article 6, § 191; the name of the employer; or any

"doing business as" names used by the employer' the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary.

79.     Due to Defendants' violations of the NYLL, Plaintiff and the Opt-In Plaintiffs are entitled to recover from Defendants fifty dollars ($50.00) for each day that the violations occurred, up to a maximum of five thousand dollars ($5,000.00), as provided for by NYLL§ 198 (1-d), reasonable attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff, on behalf of himself and all other similarly situated Collective Action Members and Opt-In Plaintiffs, respectfully request that this Court grant the following relief:

a.     Designation of this action as a collective action on behalf of the Collective Action Members and ordering the prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of an FLSA Opt-In Class, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b) and appointing Plaintiff and his counsel to represent the Collective Action Members;

b.     An order tolling the statute of limitations;

c.     A declaratory judgment that the practices complained of herein are unlawful under the FLSA and NYLL;

d.     An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with Defendants, as

provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

e.      An award of compensatory damages as a result of Defendants' failure to pay overtime compensation, pursuant to the FLSA and the NYLL and supporting regulations;

f.      An award of liquidated and/or punitive damages as a result of the Defendants' willful failure to pay overtime compensation, pursuant to the FLSA and the NYLL and supporting regulations;

g.      An award of compensatory damages as a result of Defendants' failure to pay regular wages for all hours worked, pursuant to the NYLL;

h.      An award of liquidated damages as a result of Defendants' willful failure to pay regular wages for all hours worked, pursuant to the NYLL;

i.      An award of two hundred fifty dollars ($250.00) per Plaintiff and each of the Opt-In Plaintiffs for each day that the violations of NYLL, Article 6 § 195(3), pertaining to distribution of wage statements, occurred or continue to occur, or a total of five thousand dollars ($5,000.00) per Plaintiff and each of the Opt-In Plaintiffs as provided for by NYLL, Article 6 § 198(1-d);

j.      An award of fifty dollars ($50.00) per Plaintiff and each of the Opt-In Plaintiffs for each day that the violations of NYLL, Article 6 § 195(1), pertaining to distribution of wage notice, occurred or continue to occur, or a total of five thousand dollars ($5,000.00) per Plaintiff and each of the Opt-In Plaintiffs as provided for by NYLL § 198(1-b);

k.      An award of prejudgment and post-judgment interest;

l.      An award of costs and expenses of this action together with reasonable attorneys'

and expert fees; and

m.      Such other and further relief as this Court deems just and proper.

### DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury on all questions of fact raised by the complaint.


Dated:  New York, New York
         June 6, 2023

Respectfully submitted,

**PELTON GRAHAM LLC**

By: _____
Brent E. Pelton (BP 1055)
pelton@peltongraham.com
Taylor B. Graham (TG 9607)
graham@peltongraham.com
111 Broadway, Suite 1503
New York, New York 10006
Telephone: (212) 385-9700
Facsimile: (212) 385-0800

*Attorneys for Plaintiff and the putative*
*FLSA Collective*

## **CONSENT TO BECOME PARTY PLAINTIFF**

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Cohen Brothers Realty Corporation, and/or their respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me minimum and/or overtime wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as a representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.


_____                    STELIAN M POPA
Signature                                          Printed Name